1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE SOUTHERN DISTRICT OF TEXAS

3                   GALVESTON DIVISION

4   UNITED STATES OF AMERICA      §    CASE NO. 3:19-CR-2
                                  §    GALVESTON, TEXAS
5   VERSUS                        §    WEDNESDAY,
                                  §    JANUARY 30, 2019
6   WARREN CHRISTOPHER CLARK      §    2:07 P.M. TO 4:17 P.M.

7
                      ARRAIGNMENT / DETENTION
8
                 BEFORE THE HONORABLE PETER BRAY
9                 UNITED STATES MAGISTRATE JUDGE

10

11

12  APPEARANCES:                       SEE NEXT PAGE

13  ELECTRONIC RECORDING OFFICER:      SUZANNE GUEVARA

14  CASE MANAGER:                      JASON MARCHAND

15

16

17

18

19

20               TRANSCRIPTION SERVICE BY:

21          JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                 935 ELDRIDGE ROAD, #144
22                SUGAR LAND, TEXAS 77478
                   Tel: 281-277-5325
23             www.judicialtranscribers.com

24
       Proceedings recorded by electronic sound recording;
25        transcript produced by transcription service.

2

1                           APPEARANCES:

2

3   FOR THE PLAINTIFF:              US ATTORNEY'S OFFICE
                                    Craig M. Feazel, Esq.
4                                   S. Mark McIntyre, Esq.
                                    1000 Louisiana, Ste. 2300
5                                   Houston, TX  77002
                                    713-567-9572
6
                                    US DEPARTMENT OF JUSTICE
7                                   NATIONAL SECURITY DIVISION
                                    Michael Dittoe, Esq.
8                                   950 Pennsylvania Avenue, NW
                                    Washington, DC  20530
9                                   202-307-3804

10

11
    FOR THE DEFENDANT:              FOREMAN DeGEURIN DeGEURIN
12                                  Mike DeGeurin, Esq.
                                    300 Main Street, 3rd Fl.
13                                  Houston, TX  77002
                                    713-655-9000
14

15

16

17

18

19

20

21

22

23

24

25

1                                  INDEX

2

3    WITNESS:            Direct      Cross      Redirect     Recross

4    SCOTT SOSA
      By Mr. McIntyre    13          .          .            .
5     By Mr. DeGeurin    .           47         .            .

6    WARREN ANTHONY CLARK
      By Mr. DeGeurin    71          .          .            .
7     By Mr. McIntyre    .           75         .            .

8


9
     EXHIBITS:                       Marked     Offered    Received
10
     GOVERNMENT'S:
11   Exhibits 1 through 13            12          12          .

12

13   CLOSING ARGUMENTS:          Page
      By Mr. McIntire             70, 81
14    By Mr. DeGeurin             85

15   COURT'S RULING:             87

16

17

18

19

20

21

22

23

24

25

1      GALVESTON, TEXAS; WEDNESDAY, JANUARY 30, 2019; 2:07 P.M.

2           THE COURT:  All right.  United States versus

3    Warren Clark.

4           MR. DeGEURIN:  I'm Mike DeGeurin.  He's here.

5    Brian Garris (phonetic) and Michael DeGeurin.

6           THE COURT:  Come on up.

7           MR. McINTYRE:  Mark McIntyre, Craig Feazel, and

8    Mike Dittoe for the United States, Your Honor.

9           THE COURT:  All right.  So let's do the

10   Arraignment first.  We didn't do that the other day, did we?

11          MR. McINTYRE:  No, we did not.

12          THE COURT:  All right.  Is everybody ready?

13          MR. McINTYRE:  Yes, Your Honor.

14          THE COURT:  Mr. Clark, have you received a copy of

15   the Indictment pending against you?  That is the formal

16   charges against you.

17          DEFENDANT CLARK:  Yes.

18          THE COURT:  And have you read it?

19          DEFENDANT CLARK:  Yes.

20          THE COURT:  You have to speak up just a little

21   bit.

22          DEFENDANT CLARK:  Yes.

23          THE COURT:  Thank you.

24          Count 1 of the Indictment, which only has one

25   count in it, is attempted providing of material support to a

1 designated foreign terrorist organization.  This charge

2 carries with it -- and I know I mentioned this to you the

3 other day, but I'll say it again -- up to 20 years in

4 prison, a fine of up to $250,000.

5            It's three years of supervised release, isn't it?

6 This says five.  I think it's three.

7            MR. DITTOE:  Yes.  It's five years of supervised

8 release.

9            THE COURT:  Is it?  Okay.

10            Five years of supervised release, after any term

11 of imprisonment, and a $100 special assessment.

12            MR. DITTOE:  Your Honor, forgive me, I think I'll

13 probably accept responsibility for this, made an error on

14 the charge sheet.  It's a possibility of lifetime supervised

15 release for an offense under the terrorist.  So in addition

16 to the normal five years, it's a possibility of a lifetime

17 supervised release.

18            THE COURT:  All right.  Sir, do you understand

19 that?

20            DEFENDANT CLARK:  Yes.

21            THE COURT:  All right.  Does Counsel waive formal

22 reading of the Indictment?

23            MR. DeGEURIN:  We do, Your Honor.

24            THE COURT:  Sir, how do you plead to this charge?

25            DEFENDANT CLARK:  Not guilty.

1          THE COURT:  All right.  A not guilty plea will be

2    entered on the Record for you.  Your case is assigned to

3    Judge Hanks.  This is a Galveston case.

4          Motions are due by February 12th, 2019.

5          Responses are due by February 26, 2019.

6          Pretrial Conference is set for March 8th, 2019, at

7    10:00 o'clock.

8          Jury selection and trial set for March 18th, 2019,

9    at 9:00 o'clock.

10          What's the estimated time of trial?

11          MR. McINTYRE:  One week, Your Honor.

12          THE COURT:  So I'm just going to write five days.

13          MR. McINTYRE:  Perfect.

14          THE COURT:  Just to let you know.

15          All right.  Is there anything else we need to do

16    before we go to the Detention Hearing -- other than -- and

17    I've got this motion for discovery, which I'm ready to talk

18    about, but is there anything else before we --

19          MR. McINTYRE:  No, Your Honor.

20          THE COURT:  Sir, you can sit down.  I see that you

21    are, you know, on crutches, so why don't you make yourself

22    comfortable over there?

23      (Pause in the proceedings.)

24          THE COURT:  All right.  So Docket Entry No. 11 is

25    the Defendant's Motion for Discovery and the Government, I

1  think tried to file a response, but something was going on

2  with ECF.

3            Is that filed now?

4            MR. McINTYRE:  It's filed.

5            THE COURT:  Okay.  So --

6            MR. DeGEURIN:  And I have a copy of it, Judge.

7            THE COURT:  All right.  I've read both of them.

8            So let me just say that, first of all, it is up to

9  Judge Hanks as the District Judge to decide in particular,

10 given the nature of the charges, to decide whether and what

11 documents are ultimately exchanged between the parties.

12            So what I'm going to tell you about this today is

13 pertains only to the exchange of documents with regard to

14 this hearing.  And if you want to look it up later, I think

15 the case that gives the best discussion of this is *United*

16 *States versus Lewis*, which is 769 F.Supp 1189.

17            And it cites a lot of the cases that, first of

18 all, say that a Detention Hearing is not a vehicle for full

19 discovery.  That is not supposed to be turned into a full

20 discovery hearing and, in particular, what it points out is

21 that under Federal Rule of Criminal Procedure 12, one of the

22 motions that needs to be filed before trial is a Motion for

23 Discovery under Rule 16, and that's Rule 12(b)(3)(E).

24            And the time for making such a motion is the time

25 that I just said, at the Arraignment.  And so the case I

1  just cited and many others stand for the proposition that a,

2  you know, full exchange of discovery happens before trial

3  and that it does not need to happen before the Detention

4  Hearing.

5        One exception to that is this, that if there is a

6  contested matter that appears to be crucial to the Court's

7  determination, we can talk document-by-document, or piece of

8  discovery-by-piece of discovery about whether that should

9  come to light.  But I'm not going to Order full exchange of

10  full Rule 16 discovery.

11        The other exception is obviously *Jencks Act*

12  material, which I understand the Government has no problem

13  with turning over.

14        MR. McINTYRE:  We've already turned it over, Your

15  Honor.

16        THE COURT:  All right.  And I see that you've

17  given me a binder of exhibits.

18        MR. McINTYRE:  Exhibit Book, Your Honor.

19        THE COURT:  So does that -- I understand you

20  wanted something different, but that's how we're going to do

21  this for this hearing.

22        MR. DeGEURIN:  Judge, you and I -- are on the same

23  page.  That's called *Jencks*, the discovery that they have to

24  (indiscernible), so actually exhibits that will be

25  introduced in court today.

1          THE COURT:  Okay.

2          MR. McINTYRE:  That's correct.

3          MR. DeGEURIN:  So I don't consider it *Jencks*

4   material.  That's just copies of exhibits they intend to

5   introduce from a witness that will be testifying today.  I

6   have no *Jencks* information concerning the witness who is

7   going to testify today.

8          THE COURT:  Have you --

9          MR. McINTYRE:  He has all the *Jencks* material, and

10  I told him that yesterday that that is the *Jencks*.  That's

11  what he's reviewed --

12         THE COURT:  Let's just --

13         MR. McINTYRE:  -- in preparation --

14         THE COURT:  May I just ask?

15         MR. McINTYRE:  Yes, Judge.

16         THE COURT:  Just a question.  So has -- what's the

17  agent's name that's going to testify today?

18         MR. McINTYRE:  Scott Sosa.

19         THE COURT:  Scott Sosa.  And has Scott Sosa

20  written reports of investigation?

21         MR. McINTYRE:  No.

22         THE COURT:  Has he adopted some of the reports,

23  and the meaning of that -- and I can cite you the case for

24  that, too.  It's in my handy book.  Is that if Agent Sosa

25  was involved in an investigation with another agent, and

1  that other agent wrote reports that, sort of -- that

2  basically say, oh, yeah, that's what we did and that's when

3  we did it.

4        Those reports can be considered as adopted by him.

5  So do any of those exist?

6        MR. McINTYRE:  No, Your Honor.

7        THE COURT:  All right.  And so that having been

8  said, what is it that you consider to be the *Jencks Act*

9  material that you've turned over, and is it all in this

10  book?

11        MR. McINTYRE:  It's all in this book, Your Honor.

12  So they are exhibits, but that's the material that he

13  reviewed in preparation for his testimony and how he's

14  learned of the case is talking with other agents that were

15  involved in the case.

16        THE COURT:  Okay.  That is not *Jencks Act*

17  material.  So I mean, the cases are very --

18        MR. McINTYRE:  I understand.

19        THE COURT:  -- I'm just saying it so everybody can

20  understand what I'm saying, and I'll even tell you the case

21  because it's the best case on this is *United States versus*

22  *Begaye,* B-E-G-A-Y-E, 236 F.R.D. 448.  It's out of the

23  District of Arizona, and Judge Aspey did a very good job of

24  going through the requirements under *Jencks*, and it explains

25  that a report is not adopted by the testifying agent simply

1  because he read it.

2          Just isn't, and there are many other cases that

3  agree with that.  And so I'm not going to order that those

4  be turned -- if he wrote a report, you absolutely have to

5  turn it over.

6          MR. McINTYRE:  Right.

7          THE COURT:  If another agent who he investigated

8  some part of the case with wrote a report, that sort of --

9  that goes through -- you know, just very simply if there's

10 two police officers sitting in a car and they both are doing

11 surveillance on a house and only one agent writes the report

12 and it says that the suspect came in and left on a date at a

13 time.  That report is considered to have been adopted by the

14 non-writing agent.

15          None of those exist?

16          MR. McINTYRE:  No, Your Honor.  And the issue in

17 this case is that it involves classified information, so all

18 that's going to have to be hashed out when received by the

19 Court Security Officer of the District Court, so we have

20 someone that hasn't looked at that type of information and

21 has learned about the case by talking with other agents.

22          THE COURT:  I got it, but CIPA and Court Security

23 Officers aside, if those documents exist, we have to know

24 about them.  Then we can deal with them, but you're saying

25 they don't exist and I take you at your word.

1          MR. McINTYRE:  Yes, Your Honor.

2          THE COURT:  And what else?

3          MR. DeGEURIN:  I think we'll have to take it

4   question-by-question.  I understand the position of the

5   Court, don't disagree with it completely, but they may

6   become a question, for example, when one of the exhibits

7   says, this is a summary, I may want to ask the agent how he

8   knows it's a summary.

9          THE COURT:  All right.  Well, you just take it

10  question-by-question, but it's 20 after 2:00.  Let's go.

11         Call your first witness.

12         MR. DeGEURIN:  Yes, Your Honor.

13         May we return to our table?

14         THE COURT:  Please.

15         MR. McINTYRE:  Call Task Force Officer Scott Sosa,

16  please.

17         THE COURT:  By the way, before we start, has

18  everybody got a copy of the Pretrial Report?

19         MR. DeGEURIN:  We do, Your Honor.

20         MR. McINTYRE:  We do, Your Honor, and we're moving

21  Exhibits 1 through 13, to admit those, Your Honor.

22      (Government's Exhibits Nos. 1 through 13 marked and

23  offered.)

24         THE COURT:  Any objection for this hearing?  I

25  haven't even looked at it.

1          MR. DeGEURIN:  So long as it's not made a Record

2     that I'm waiving objections --

3          THE COURT:  You're not.

4          MR. DeGEURIN:  Okay.

5          THE COURT:  We're just going to look at them for

6     this hearing only and then you-all need to try to admit

7     whatever you want to admit in front of Judge Hanks.

8          But the question about the Pretrial Report,

9     everybody has read it?

10          MR. DeGEURIN:  Yes.

11          THE COURT:  And are there any objections to it, or

12     can I rely on it?

13          MR. McINTYRE:  No objections from the Government,

14     Your Honor.

15          MR. DeGEURIN:  Yeah, you can rely on it.

16          THE COURT:  All right.  Go ahead.

17       (Witness sworn.)

18          THE WITNESS:  I swear.

19               DIRECT EXAMINATION OF SCOTT SOSA

20     BY MR. McINTYRE:

21     Q    State your name for the Record, please.

22     A    Scott Sosa.

23     Q    And Mr. Sosa, where are you currently employed?

24     A    I'm employed with the City of Sugar Land, a task

25     officer assigned to the FBI Joint Terrorism Task Force.

SCOTT SOSA - DIRECT BY MR. McINTYRE                    14

1   Q     And what is the Joint Terrorism Task Force?

2   A     It's a task force made up of FBI Agents, other agents

3   from other agencies, municipal officers like myself, and we

4   investigate allegations of terrorism activities,

5   intelligence gathering, surveillance, interviews.

6   Q     And how long have you been a Joint Terrorism Task Force

7   Officer?

8   A     Since May of 2018.

9   Q     Now prior to becoming a Joint Terrorism Task Force

10  Officer, did you have any prior law enforcement experience?

11  A     Yes, sir.

12  Q     And what is that prior law enforcement experience,

13  going by the most recent law enforcement experience you

14  have.

15  A     Recently assigned as a Detective for the Sugar Land

16  Police Department, Criminal Investigations Division in 2013.

17  Q     Okay.  So when did you start as a Detective at the

18  Sugar Land Police Department?

19  A     Correction, 2003.

20  Q     So from 2003 until 2018; is that correct?

21  A     That's correct.

22  Q     And what sort of cases did you investigate as a

23  detective for the City of Sugar Land?

24  A     Persons crimes.

25  Q     And what are persons crimes?

SCOTT SOSA - DIRECT BY MR. McINTYRE                    15

1    A     Persons crimes were like homicides, robberies, sexual

2    assaults, threats, harassments.

3    Q     And prior to 2003 then you became a Detective with

4    Sugar Land, do you have any law enforcement experience prior

5    to that?

6    A     Yes, sir.

7    Q     And what did you do in law enforcement prior to 2003?

8    A     I was hired by the City of Sugar Land in 1997 as a

9    patrolman.

10   Q     And do you have any educational training that would

11   help you in your law enforcement duties?

12   A     Yes, sir.

13   Q     What is that?

14   A     I have an Associates in Criminal Justice.

15   Q     And have you had any training during the course of your

16   time as a law enforcement officer?

17   A     Yes, sir.

18   Q     How much training have you had?

19   A     I have ongoing in-service training for the 22 years

20   that I've been with the Sugar Land Police Department.

21   Q     Now you're here to testify regarding the facts of the

22   case regarding Warren Clark; is that correct?

23   A     That's correct.

24   Q     How did you acquire that information?

25   A     I acquired that information from FBI Agents that I

SCOTT SOSA - DIRECT BY MR. McINTYRE                    16

1  worked with in the Joint Terrorism Task Force.

2  Q    And based on your understanding of the investigation,

3  did the FBI receive information in 2011 regarding the

4  Defendant, Mr. Clark?

5  A    Yes, sir.

6  Q    And can you tell the Court what information the FBI

7  received in 2011?

8  A    The FBI received information that Warren Clark was

9  hosting a YouTube channel called "Jihadi Fan Club."

10 Q    And when the FBI received that information regarding

11 Jihadi Fan Club, what was the concern that the person

12 reporting had with the Jihadi Fan Club YouTube site?

13 A    Because he was advocating the killing of enemy

14 combatants, that Islam was going to take over the world.

15 Q    And specifically, did the FBI look at the YouTube site

16 run by Mr. Clark and were there things of concern to the FBI

17 when they looked at that?

18 A    Yes, sir.

19 Q    And can you tell me a couple of the things that caught

20 the attention of the FBI when they looked at this YouTube

21 site hosted by Mr. Clark?

22 A    Yes, sir.

23 Q    For example, was there one talking about paradise?

24 A    Yes, sir.

25 Q    And what did the site say regarding paradise?

1   A    It says there's paradise for killing the enemy of

2   Islam, such as American military combatants.

3   Q    And did Mr. Clark have some postings on suicide

4   bombing?

5   A    Yes, sir.

6   Q    And what did he say about suicide bombing?

7   A    Suicide bombing is 100 percent justified.

8   Q    And did he have information --

9              THE COURT:  Can I just ask?  Sorry.

10             MR. McINTYRE:  Yes.

11             THE COURT:  Are these videos?

12             THE WITNESS:  I've --

13             THE COURT:  Or who is saying -- I don't

14  understand.  I'm thinking on two levels.  Is it a website

15  where these things are posted or are these videos where

16  somebody is saying these words?

17             THE WITNESS:  I don't know the answer to that,

18  Your Honor, but I believe it's saying the words.  It's on a

19  YouTube site, is my understanding, but I don't have the

20  exact answer to that.

21             THE COURT:  Do you?

22             THE WITNESS:  I don't think he does either.

23             MALE VOICE:  No, sir.

24             MR. DITTOE:  Your Honor, I believe some of the --

25  some of this consists of comments that an individual made,

1    as well.  And so I believe that some of this consists of

2    texts written on the YouTube channel by Mr. Clark.  And --

3            THE COURT:  Well -- and I'm not trying to give you

4    a hard time, but it would be better if the witness were to

5    tell us that.

6            MR. DITTOE:  I apologize, Your Honor, I was

7    just --

8            THE COURT:  I understand, but I'm not going to

9    take what you're saying as evidence.  I'm going to take what

10   he says as evidence.

11           MR. DITTOE:  I understand, Your Honor.  I

12   understand.

13           THE COURT:  Thank you.

14           MR. McINTYRE:  And the answer was, he does not

15   know.

16           THE COURT:  Thank you.

17   BY MR. McINTYRE:

18   Q    And was there also information on the website about

19   Islam being a threat?

20   A    Yes, sir.

21   Q    And what was that information that was on the website

22   when the FBI looked at it in 2011?

23   A    Islam is a threat to the United States Government and

24   we, as Muslims, will overthrow it.

25   Q    Now --

1        MR. DeGEURIN:  Your Honor, may I have just one

2   moment, please?

3            THE COURT:  Sure.

4        (Pause in the proceedings.)

5            MR. DeGEURIN:  Okay, Judge.

6            THE COURT:  Go ahead.

7   BY MR. McINTYRE:

8   Q    In 2013 did the FBI receive any information about

9   Mr. Clark traveling overseas?

10  A    Yes, sir.

11  Q    And what was the information that they received?

12  A    Mr. Clark was traveling to Saudi Arabia.

13  Q    And did the FBI make an attempt to interview Mr. Clark

14  before he left for Saudi Arabia in 2013?

15  A    Yes, sir.

16  Q    And was he asked questions by the FBI when he left for

17  Saudi Arabia in 2013?

18  A    Yes, sir.

19  Q    And was he asked specifically about whether he had made

20  statements against the United States?

21  A    Yes, sir.

22  Q    And what did he say?

23  A    He said no to those questions.

24  Q    And was he asked if he expressed support for violence

25  against the United States?

1  A     Yes.  He was asked that.

2  Q     And what did he say?

3  A     No.

4  Q     Now moving to 2014, did the FBI receive information

5  that Mr. Clark would be arriving back in the United States

6  from Saudi Arabia?

7  A     Yes, sir.

8  Q     And did they take efforts to interview Mr. Clark when

9  he arrived back in the United States in 2014?

10 A     Yes, sir.

11         THE COURT:  20-what?  '14, you say?

12         MR. McINTYRE:  2014, yes, Your Honor.

13 BY MR. McINTYRE:

14 Q     And was he questioned about the Jihadi Fan Club YouTube

15 site?

16 A     Yes, sir.

17 Q     And what did he say about that?

18 A     Clark told the FBI that he controlled the YouTube

19 channel Jihadi Fan Club.

20 Q     And was he also -- did he also provide information

21 about having communications with a United Kingdom person?

22 A     Yes, sir.

23 Q     And what specific information do you have about that?

24 A     He admitted having contact with a citizen of the United

25 Kingdom that was charged with encouraging people to support

1  ISIS.

2  Q    Now later in 2014, did the FBI receive information

3  regarding postings that Mr. Clark was making on a Muslim

4  public service group website?

5  A    Yes, sir.

6  Q    And the person that called and reported those postings,

7  what information was provided to the FBI, according to your

8  understanding of the case?

9  A    That Clark was making posts in support of ISIS.

10  Q    And did the FBI make efforts to look at those posts

11  that Mr. Clark was putting on the Muslim public service

12  group website?

13  A    Yes, sir.

14  Q    And for example, was there a post about ISIS hiding?

15  A    Yes, sir.

16  Q    What was that post?

17  A    ISIS is bringing justice by fighting, capturing and

18  executing soldiers harming Muslims.

19  Q    And was there a post about Islam as religion and

20  whether it was a pacifist religion?

21  A    Yes, sir.

22  Q    And what was that post -- or a summary of that post?

23  A    Islam is not a pacifist religion.

24  Q    And was there any opinion expressed by Mr. Clark in

25  those posts about how the Islamic State spreads?

1  A    Yes, sir.

2  Q    What did he say?

3  A    Islamic State always spreads by force.

4  Q    And this was in 2014 that these posts were made; is

5  that correct?

6  A    That's correct.

7  Q    Now in 2015, early 2015, did the FBI receive

8  information about Clark traveling overseas?

9  A    Yes, sir.

10 Q    And what was the information that they received

11 regarding Mr. Clark in early 2015?

12 A    That he was traveling to Saudi Arabia.

13        MR. DeGEURIN:  Your Honor, may I ask Counsel

14 something?

15        THE COURT:  Sure.

16     (Pause in the proceedings while Counsel confer.)

17        THE COURT:  Ready?

18        MR. DeGEURIN:  Yes, Your Honor.

19 BY MR. McINTYRE:

20 Q    And so did the -- when the FBI learned Mr. Clark was

21 flying overseas again, did they interview Mr. Clark?

22 A    Yes, sir.

23 Q    And what did Mr. Clark tell the FBI about his

24 intentions and where he was going and what he was going to

25 do in 2015?

1  A    That he obtained employment with Saudi Aramco.

2  Q    And Saudi Aramco, is that an oil and gas company in

3  Saudi Arabia?

4  A    Yes, sir.

5  Q    And so that's why he was going to Saudi Arabia; is that

6  correct?

7  A    That is correct, sir.

8  Q    Now, later on shortly after Mr. Clark left, did the FBI

9  learn that Mr. Clark had been terminated by Saudi Aramco?

10 A    Yes, sir.

11 Q    And what is your understanding of why Saudi Aramco

12 terminated Mr. Clark in 2015?

13 A    Clark had provided false information in his application

14 and provided fake paystubs.

15 Q    And so when Mr. Clark was terminated, what was your

16 understanding as to the arrangement Saudi Aramco made for

17 Mr. Clark to return back to the United States?

18 A    Saudi Aramco had purchased a ticket for Clark that took

19 Clark to Turkey, and then on to the United States.

20 Q    So when you say it took him to Turkey, there was a

21 stopover in Turkey and then on to the United States?

22 A    That is correct.

23 Q    So let me take you to later in 2015.  Was there

24 information that the FBI received from the State Department

25 that concerned Mr. Warren Clark?

1   A    Yes, sir.

2   Q    Okay.  And let me have you take a look at Exhibit No. 1

3   that's been admitted for the purposes of this Detention

4   Hearing?

5   A    (Perusing document.)

6   Q    And you've read that email and is that correct?

7   A    That is correct.

8   Q    And is this an email that the FBI received via the

9   State Department?

10  A    That is correct.

11  Q    And what is your understanding as to who the author of

12  that email is?

13  A    The author is Warren Clark.

14  Q    And how would -- what is your understanding as how the

15  State Department acquired this Warren Clark email?

16  A    Warren Clark's father forwarded the email to the State

17  Department.

18          DEFENDANT CLARK:  I'm sorry.  I didn't hear that.

19          Could you?

20          MR. McINTYRE:  He said Warren Clark's father

21  forwarded Warren Clark's email to the State Department, so

22  they got it.

23  BY MR. McINTYRE:

24  Q    And this email from Mr. Clark, did it have any

25  information on where Mr. Clark was as of August 8th of 2015?

1    A    Yes, sir.

2    Q    And what did it say as to where he was?

3    A    Clark crossed the border from Turkey into Syria and

4    then he was in the Islamic State.

5    Q    And did the email from Warren Clark to his father, did

6    it explain whether he had taken any sort of military

7    training from the ISIS terrorist organization?

8    A    Yes.

9    Q    What did he say about that?

10   A    He said I was forced to go to a mandatory training.

11   Q    Was that military training or religious training, or

12   both?

13   A    In the email it states mandatory military training.

14   Q    And what did he say about the area he was staying in?

15   Was it peaceful or was it warlike or what was going on in

16   the area where he was at that time?

17   A    That he was in a war zone.

18   Q    And did he make a statement on whether he planned on

19   fighting?

20   A    Yes.

21   Q    And what did he say?

22   A    He said I not plan on fighting or going to war.

23   Q    Now after receiving this email sometime after August of

24   2015, and based on the other information we discussed from

25   2011 and 2014, did the FBI obtain search warrants for

SCOTT SOSA - DIRECT BY MR. McINTYRE                    26

1  Mr. Warren Clark's email account?

2  A    Yes, sir.

3  Q    And did they also obtain search warrants for his social

4  media?

5  A    Yes, sir.

6  Q    So I'm going to take you to Exhibit No. 2, and you've

7  looked over this information; is that correct?

8  A    That is correct.

9  Q    And this information is what?

10  A    These are comments Warren Clark made on social media.

11  Q    So these would be called commonly "posts" made on

12  social media; is that correct?

13  A    Yes.

14  Q    Okay.  And for example, there were several posts made

15  on, I believe, June 14th at 2015; is that correct?

16  A    That is correct.

17  Q    And I'm not going to have you read, obviously, all of

18  these posts, but can you tell me whether there were posts

19  from Mr. Clark on June 14th at 2015 that involved the

20  beheading of people?

21  A    Yes, sir.

22  Q    And what did he say about that?

23  A    Beheading people is Islamic.

24        THE COURT:  What page are you on?  The very first

25  page?  The 123?

1          THE WITNESS:  123.

2          THE COURT:  How far down are you?

3          THE WITNESS:  I'm right here, sir (indicating).

4          THE COURT:  Thanks.

5          So it looks like it's the fourth paragraph down

6   that they're referring to.

7          THE WITNESS:  Correct, Your Honor.

8          THE COURT:  All right.  Go ahead.  I'm sorry to

9   interrupt.

10  BY MR. McINTYRE:

11  Q    And did he also make a statement regarding the killing

12  of prisoners?

13  A    Yes, sir.

14  Q    And what statement did he make in that regard?

15  A    He said it is permissible to kill prisoners.

16  Q    Now as we go through the posts, were there several

17  posts the next date on June 15th at 2015?

18  A    Yes, sir.

19  Q    And was there a post about the Islamic State?

20  A    Yes, sir.

21  Q    And what did Mr. Clark post about the Islamic State on

22  that day?

23  A    Long live the Islamic State.  They are the only ones

24  doing Jihad.

25  Q    And did he make a second statement on that day about

1  something not being haram?

2  A    Yes.

3  Q    And can you tell the Court what haram means?

4  A    It is not harm to kill in front of kids.

5  Q    Okay.  And when you say --

6         THE COURT:  Sorry.  Where are you again?  Try to

7  identify a little bit where you're at in the email.  I know

8  you know where you're at, but I don't.

9         THE WITNESS:  Your Honor, where would you like me

10 to start?

11        THE COURT:  Just -- are you on page 124?  Wherever

12 you just read.

13        THE WITNESS:  Okay.  That's page 116.  You're

14 talking about it is not haram to kill in front of kids?

15        THE COURT:  Yeah, oh, okay.

16        And how far down are you?

17        THE WITNESS:  It's page 116.  It's going to be the

18 fourth section.

19        THE COURT:  Thank you.  Let's just do that.  From

20 now on if we could?

21        MR. McINTYRE:  Okay.

22        THE COURT:  Because it's hard to follow.  I'm

23 sorry.

24        MR. McINTYRE:  I hear you.  And -- yeah, well,

25 anyway -- okay.

1  BY MR. McINTYRE:

2  Q    So there's nothing haram about killing in front of

3  children.  And what does haram mean in Arabic, to your --

4  the best of your understanding?

5  A    Forbidden.

6  Q    And now on September 8th of 2018 --

7         MS. MARCHETTE:  And this is going to be, Your

8  Honor, on page 163, last page in Exhibit 2.

9         THE COURT:  Okay.

10  BY MR. McINTYRE:

11  Q    This is what's called a status update, I guess, in

12  social media jargon; is that correct?

13  A    That is correct.

14  Q    And it's a very long post; is that correct?

15  A    That is correct.

16  Q    And again, I'm not going to have you read the whole

17  post because the Court can read it.

18      Can you tell me what Mr. Clark says about his current

19  location on September 8th of 2015?

20  A    He is currently living in the Islamic State.

21  Q    And how did he come to be in the Islamic State in 2015?

22  A    Ran across the Turkish border into what was formerly

23  known as "Syria."

24  Q    Okay.  And did he mention anything about religious

25  and/or military training?

1   A     Yes, sir.

2   Q     What did he say?

3   A     After one or two months of religious classes and

4   military training, you're allowed to go into the city and

5   live freely.

6   Q     And once you've completed the military and religious

7   training, do you have a -- did the men have a choice to

8   become a civilian or a soldier, according to Mr. Clark?

9   A     Yes.  Yes, sir.

10  Q     And what percentage of people that have completed

11  military training with ISIS choose to become a soldier?

12  A     99 percent.

13  Q     And this is according to Mr. Clark; is that correct?

14  A     That is correct.

15  Q     And Mr. Clark also says if you choose to become a

16  civilian, there are certain things that will not be

17  provided; is that correct?

18  A     That is correct.

19  Q     What does he say if you choose to become a civilian for

20  ISIS, what things will not be provided for you?

21  A     It says if you're not given a choice -- if you do not

22  -- if you choose to be a civilian, then Islamic State will

23  not provide any assistance to you.

24  Q     So you're kind of on your own; is that right?

25  A     That's correct.

1  Q    And does he also make a statement about it being hard

2  to get hired if you're a civilian because people don't trust

3  you?

4  A    Yes, sir.

5  Q    Okay.  And it seems like this post is kind of letting

6  people know how life in the Islamic State is; is that how

7  you understand it?

8  A    Yes, sir.

9  Q    And it seems like there's, I guess, a question about

10 whether there are slaves in the Islamic State and does

11 Mr. Clark answer that question?

12 A    Yes, sir.

13 Q    And what does he say about the existence of slaves in

14 the Islamic State?

15 A    Slaves do exist here.

16 Q    Now I'm going to take you to Exhibit No. 3.  And can

17 you tell the Court what Exhibit No. 3 is?

18 A    It's an electronic communication between Clark and a

19 17-year-old.

20 Q    And this electronic communication between Mr. Clark and

21 a 17-year-old was obtained from the same social media

22 account; is that correct?

23 A    That is correct.

24 Q    Okay.  And can you tell the Court based on your reading

25 of these messages between the 17-year-old and Mr. Clark,

1  what did the 17-year-old want to do?

2  A    The 17-year-old wants to travel to Turkey and then

3  cross over the border into Syria and enter the -- and join

4  the Islamic State.

5  Q    And these occurred in April and May of 2015; is that

6  correct?

7  A    That is correct.

8  Q    And based on your understanding of the case, where

9  would Mr. Clark have been geographically in April or May of

10 2015?

11 A    In Turkey.

12 Q    And specifically in Konya, Turkey; is that correct?

13 A    That's correct.

14 Q    And at one point during the communication -- and I

15 think this is going to be on page 475 or page 2 of

16 Exhibit 2.  There's a question where Mr. Clark asks the

17 17-year-old, are you going to the caliphate, which is ISIS,

18 just to live or do you want to fight, or are you not sure?

19      And what was the response from the 17-year-old?

20 A    Martyrdom.

21 Q    And what is your understanding of martyr?

22 A    To die a violent Jihad.

23 Q    And after the 17-year-old tells Mr. Clark that he wants

24 to go to ISIS and martyr himself, what is the response from

25 Mr. Clark?

1  A     God willing you'll be in the Islamic State soon.

2  Q     So he's God willing to a 17-year-old martyr himself; is

3  that correct?

4  A     That is correct.

5  Q     And after learning that the 17-year-old wants to martyr

6  himself in the Islamic State, does Mr. Clark provide advice

7  for the 17-year-old on how to get into Turkey and over to

8  Syria?

9  A     Yes, sir.

10 Q     And what sort of advice does he give him?

11 A     He gives him advice to possibly fly into Turkey and if

12 cannot fly into Turkey to take a ferry or a boat to get to

13 Turkey.

14 Q     And does Mr. Clark also agree to help the 17-year-old

15 once he arrives in Turkey?

16 A     Yes, sir.

17 Q     And what does he say he'll do to help the 17-year-old

18 get into ISIS territory?

19 A     He said he would arrange a bus to pick him up from

20 Istanbul and take him to Konya and he would pick him up in

21 Konya bus station.

22 Q     And later during these messages, does Clark indicate

23 that he's waiting on the 17-year-old to arrive in Turkey?

24 A     Yes, sir.

25 Q     And why is he waiting on the 17-year-old to arrive in

1  Turkey?

2  A    He's waiting on him to get there because it would be

3  difficult to travel alone.

4            MR. DeGEURIN:  What page are you on?

5            MR. McINTYRE:  Which page is that one?

6            THE WITNESS:  It's page 436.

7            MR. McINTYRE:  436.

8            THE COURT:  Could I just ask if you can just,

9  please.  Are these messages, they're just between Clark and

10 the 17-year-old?  They're not public posts?

11           THE WITNESS:  No, sir.  It's communication between

12 the two and the two alone.

13           THE COURT:  And these were obtained by a search

14 warrant of Clark's social media account?

15           MR. McINTYRE:  That's correct, Your Honor.

16           THE COURT:  Okay.  Thanks.

17 BY MR. McINTYRE:

18 Q    And during these communications, do they also -- the

19 17-year-old and Clark talk about the fact that they may be

20 monitored or spied upon when they're communicating?

21 A    Yes, sir.

22 Q    And do Mr. Clark and the 17-year-old discuss ways to

23 evade a monitor or having their communications monitored

24 A    Yes.

25 Q    Now, you also got a -- or FBI obtained a search warrant

1  for Mr. Clark's email account; is that correct?

2  A    That is correct.

3  Q    And I'm going to have you take a look at Exhibit No. 4

4  and can you tell the Court what Exhibit No. 4 is?

5  A    That is an email from Warren Clark to his sister.

6  Q    And what was the date of this email?

7  A    August 3rd, 2015.

8  Q    And where does Mr. Clark tell his sister he is?

9  A    I am in the Islamic State.  I am in the City of Mosul,

10 Iraq.

11 Q    Let's turn to Exhibit No. 5.  And can you tell the

12 Court who this email is between?

13 A    Warren Clark and his sister.

14 Q    And what's the date on this email?

15 A    8/10/2015.

16 Q    And what does Mr. Clark tell his sister in regard to

17 how he got into the Islamic State?

18 A    He states I illegally crossed the border to Syria from

19 Turkey.

20 Q    And what does he say about religious and military

21 training from ISIS?

22 A    He said we all took mandatory religious and military

23 training for over a month.

24 Q    And what does Mr. Clark say about whether he wants to

25 go home or not go home?  Home being the United States?

1   A     Right.  He said I can't go home without running the

2   risk of arrest.

3   Q     And what does Mr. Clark tell his sister regarding any

4   contact with the Government?

5   A     He said, do not contact Government agencies.

6   Q     And what does Mr. Clark tell his sister about his state

7   of mind while living in the Islamic State?

8   A     He said I'm happy to -- happy and safe in the Islamic

9   State.

10  Q     And what was his -- what did his stated purpose for

11  moving to the Islamic State?

12  A     I moved here to help build the state.

13  Q     And this email, on August 10th, is in response to email

14  from his sister that was sent on August 9th; is that

15  correct, as part of the same one entity?

16  A     That is correct.

17  Q     And in the email on August 9th, she's giving him

18  information on how to contact an embassy and get back to the

19  United States; is that correct?

20  A     That is correct.

21  Q     And the response from Mr. Clark at that time is he does

22  not want to go home; is that right?

23  A     That is correct.

24        MR. DeGEURIN:  Excuse me.  What page are you on?

25        MR. McINTYRE:  I'm on Exhibit 5.  There's only two

1  pages.

2          So the one in the back is the first one from the

3  sister.

4          MR. DeGEURIN:  Oh, you go backwards to that.

5          THE COURT:  Well, hold on.  Let's do this -- you

6  know, speak to the witness or to me and let's make the court

7  reporter hear it all

8  BY MR. McINTYRE:

9  Q    Okay.  Just for clarity, on Government's Exhibit No. 5,

10 the second page, is the first email from the sister; is that

11 correct?

12 A    That is correct.

13 Q    And that's on August 9th?

14 A    That is correct.

15 Q    And the second email is actually the first one in the

16 exhibit and it's on August 10th; is that correct?

17 A    That is correct.

18 Q    And let me take you to Government's Exhibit No. 6.

19     And can you tell me what Government's Exhibit No. 6 is?

20 A    That is an email from Warren Clark to his sister.

21 Q    And what's the -- and it's a series of emails; is that

22 correct?

23 A    That is correct.

24 Q    And in particular, the email we're focusing on in the

25 middle, what is the date on that email that I'm going to ask

1  you about?

2  A    That is Wednesday, August the 12th, 2015.

3  Q    And what does Mr. Clark state about his situation and

4  how he's taking care of himself while he's in the Islamic

5  State?

6  A    Right now I have my own cash money and the Islamic

7  State is taking care of living expenses.

8  Q    So he tells his sister the Islamic State is taking care

9  of living expenses; is that correct?

10 A    That is correct.

11 Q    I'm going to take you to Exhibit No. 7.  And there's

12 two emails in Exhibit No. 7, both on the same day; is that

13 correct?

14 A    That is correct.

15 Q    And what day is that?

16 A    That is August 30th, 2015.

17 Q    And who are those emails between?

18 A    That is Warren Clark to his sister.

19 Q    And what does Warren Clark say that he is doing within

20 the Islamic State on -- as of August 30th of 2015?

21 A    He states I've got a job working in administration and

22 helping with sick.

23 Q    And does he also say that he's doing something else

24 within the Islamic State?

25 A    Yes.

SCOTT SOSA - DIRECT BY MR. McINTYRE                    39

1   Q    What does he say he's doing?

2   A    He says I've got a job working and providing room and

3   board for various people living in the city.  I am located

4   in the city.

5   Q    And is he referring to the City of Mosul, to the best

6   of your knowledge?

7   A    Yes, sir.

8   Q    Let me take you to Exhibit No. 8.  And can you tell me

9   what Exhibit No. 8 is?

10  A    It's an email from Clark to his sister.

11  Q    And what's the date of the email?

12  A    September 11, 2015.

13  Q    And again, I'm not going to have you read the email,

14  but can you tell me whether Mr. Clark states an intention on

15  whether he's ever returning to the United States?

16  A    Yes.

17  Q    What does he say?

18  A    I do not plan on returning to the United States unless

19  the United States stops fighting Islamic State or the

20  Islamic State conquers us -- conquers the U.S. -- I'm sorry.

21  Q    Unless the Islamic State conquers the United States?

22  A    Yes.

23  Q    And what does he say about when he formed his intention

24  to enter the Islamic State?  At what point in time during

25  his travels?  Specifically I'm referencing Saudi Aramco.

SCOTT SOSA - DIRECT BY MR. McINTYRE                    40

1  A    Right.  He says after leaving Saudi Aramco, I plan on

2  going to the Islamic State.

3  Q    And there's -- I think is there further verbiage about

4  he was going to stay in Saudi Arabia because he thought the

5  Islamic State was going to take over Saudia Arabia?

6  A    Yes, sir.

7  Q    Okay.  And eventually he went to the Islamic State?

8  A    Yes, sir.

9  Q    And does he express an opinion why he can never return

10 or could not return to the United States?

11 A    Yes, sir.

12 Q    What does he say?

13 A    He says no way to return because the United States is

14 at war with the country.

15 Q    Is --

16 A    If I go to the airport in the United States, I would be

17 thrown in prison.

18 Q    Let me take you to Exhibit No. 9.  And this is on

19 September 13th at 2015; is that correct?

20 A    That is correct.

21 Q    And who is it -- who is Warren Clark emailing in this

22 particular email?

23 A    This one is emailed to his sister.

24 Q    And can you tell me whether Mr. Clark has an opinion on

25 whether the Islamic State is going to expand?

SCOTT SOSA - DIRECT BY MR. McINTYRE                    41

1   A    Yes.

2   Q    What does he say?

3   A    Sooner or later the Islamic State will take over more

4   countries.

5   Q    What does he say about whether he wants to live in the

6   United States?

7   A    He says I ultimately want to live in a Muslim country,

8   not the United States.

9   Q    And what does he say about whether the Islamic State

10  would be smart even to let someone like him return to the

11  United States?

12  A    He says the Islamic State most likely will not let me

13  return, to be allowed to simply return to the United States

14  knowing as much information I do would not be smart on the

15  Islamic State's part.

16  Q    So it wouldn't be smart for someone with as much

17  information as him, to be allowed to return to the United

18  States?

19  A    Correct.

20  Q    That's his opinion; is that correct?

21  A    That is correct.

22  Q    I'm going to take you to Exhibit No. 10.  And Exhibit

23  No. 10 is an email on September 22nd at 2015; is that

24  correct?

25  A    That's correct.

SCOTT SOSA - DIRECT BY MR. McINTYRE                    42

1  Q    And is it your understanding these emails are from

2  Warren Clark to his mother; is that right?

3  A    That is correct.

4  Q    And what does Mr. Clark tell his mother about whether

5  he's living and his living expenses and those types of

6  matters?

7  A    He says I am currently living in a dormitory where my

8  housing and food is paid for.

9  Q    And directing your attention back to the post that we

10  talked about earlier in September, did Mr. Clark indicate

11  that civilians were not taken care of by the Islamic State?

12  A    That is correct.

13  Q    And where does Mr. Clark in this email say he's living?

14  Close to which city?

15  A    He is living -- nearest big city to me is Mosul.

16  Q    And in this same email, I'll take you back to

17  Exhibit 10, does he say he's looking for a job as a teacher

18  in the Islamic State?

19       Take your time reading it.

20  A    That is correct.

21  Q    Okay.  And going to Exhibit No. 11.  Can you tell me

22  what Exhibit No. 11, what that relates to and who that email

23  is between?

24  A    It's an email from Clark to his sister.

25  Q    This is, again, to his sister; is that right?

1  A     That is correct.

2  Q     What's the date on this email?

3  A     September 27, 2015.

4  Q     And when Mr. Clark emails his sister on that date, what

5  does he say about his intention of returning to the United

6  States?

7  A     He says I am not returning to the United States.

8  Q     And where does he -- what citizenship is he claiming

9  during this email to his sister?  What is he saying about

10 his citizenship?

11 A     He states:  I am a citizen of the Islamic State and no

12 longer a citizen of the US -- the United States.

13 Q     I'm going to take you to Government Exhibit No. 12.

14 And can you tell me what Government's Exhibit No. 12 is?

15 A     That is a résumé and cover letter.

16 Q     And is it your understanding this is from Warren Clark?

17 A     That is correct.

18 Q     And can you tell me what all of the name at the top

19 says, Abu Mohammad; is that correct?

20 A     That is correct.

21 Q     There's an email attached to Abu Mohammad's, which is

22 the Warren Clark email that we've been discussing; is that

23 correct?

24 A     That is correct.

25 Q     And have you also looked at the education and training

SCOTT SOSA - DIRECT BY MR. McINTYRE                    44

1   and work experience in this résumé and does it match up with

2   the Warren Clark life experiences?

3   A    Yes, sir.

4   Q    And there's also on page 2, there's a cover letter; is

5   that correct?

6   A    That is correct.

7   Q    And the name used there is what?  Abu Mohammad Al

8   Amariki (phonetic)?

9   A    Yes, sir.

10  Q    And it's the same Warren Clark email, though; is that

11  correct?

12  A    That is correct.

13  Q    And he's apparently writing it to a director; is that

14  right?

15  A    Correct.

16  Q    And what does the first sentence of this cover letter

17  say regarding what he wants to do?

18  A    I am looking to get a position teaching English to

19  students in the Islamic State.

20  Q    And where was this résumé and cover letter recovered?

21  A    In a house in Mosul, Iraq.

22  Q    Now in late December or early January -- late December

23  2018 or early January 2019, was it your understanding that

24  Mr. Clark was captured?

25            THE COURT:  When was that?  Did you say the date?

SCOTT SOSA - DIRECT BY MR. McINTYRE                45

1           MR. McINTYRE:  It's late December, early January.

2           THE COURT:  Thank you.

3   BY MR. McINTYRE:

4   Q    Is it your understanding Mr. Clark was captured?

5   A    That is correct.

6   Q    And do you know where he was captured?

7   A    In Syria.

8   Q    And who were the people that captured Mr. Clark?

9   A    The Syrian Democratic Forces.

10  Q    And what are the Syrian Democratic Forces?

11  A    It's an alliance of Kurdish, Arab, and Syrian militias.

12  Q    And after Mr. Clark was captured, was he interviewed by

13  NBC News?

14  A    Yes, sir.

15  Q    And he was in the custody of the Syrian defense force

16  at that time; is that correct?

17  A    I believe so, sir.

18          MR. McINTYRE:  Your Honor, I was going to play a

19  2-1/2 minute DVD.

20          THE COURT:  All right.

21          MR. DeGEURIN:  I believe the length of it, Judge?

22          THE COURT:  Okay.

23          MR. DeGEURIN:  Setting it up.

24          THE COURT:  Do we -- where did Jason go?

25          MALE VOICE:  I called Jason to see if he had a

1   player over here.

2           Jason, did you hear your name?

3           COURTROOM DEPUTY:  I did hear my name and I told

4   you I would set it up.

5           THE COURT:  Here, you know what?  Take a -- just

6   take five and set it up and we'll come right back.

7           MR. McINTYRE:  Okay, perfect.  Thank you.

8           COURTROOM DEPUTY:  All rise.

9       (Recess taken from 2:59 p.m. to 3:13 p.m.)

10                          AFTER RECESS

11          THE COURT:  Are we ready?

12          MALE VOICE:  We're ready.

13          THE COURT:  Is everybody here that needs to be?

14          COURTROOM DEPUTY:  I believe so.

15          THE COURT:  All right.  Let's go.

16          All right.  Mr. McIntyre, go ahead.

17          MR. McINTYRE:  I'm just going to play the video.

18          THE COURT:  Okay.  Is this --

19          MR. McINTYRE:  It's NBC News.

20          MR. DeGEURIN:  Is there an exhibit number?

21          MR. McINTYRE:  13.

22          THE COURT:  Okay.  So this is 13.  Go ahead.

23      (Government's Exhibit 13, a video, was played to the

24   Court.)

25          MR. McINTYRE:  Your Honor, I think that's all we

1   need to play.  The rest of it is kind of --

2            THE COURT:  Okay.

3        (Video stopped.)

4            MR. McINTYRE:  Thank you.

5            THE COURT:  What was the date of that interview?

6            MR. McINTYRE:  January -- let's see.  I don't

7   know, Your Honor.

8            THE COURT:  But it was January of this year?

9            MR. McINTYRE:  Yes.

10            THE COURT:  Okay.  So very recently, okay.

11            Go ahead.

12            MR. McINTYRE:  I'll pass the witness, Your Honor.

13            THE COURT:  Okay.  Cross?

14                CROSS-EXAMINATION OF SCOTT SOSA

15   BY MR. DeGEURIN:

16   Q    Mr. Sosa, is it Sosa?

17   A    Yes, sir.

18   Q    You worked in the Task Force in Sugar Land as an FBI

19   Agent; is that correct?

20   A    I'm a Task Force Officer.  I'm not an agent, sir.

21   Q    You're not an FBI Agent?

22   A    No, sir.

23   Q    So what is your title?

24   A    Task Force Officer.

25   Q    Police officer?

1    A    Yes, sir.

2    Q    Not that that's bad, I'm just trying to get it.  I was

3    told an FBI Agent was going to be testifying.

4    A    Okay.

5    Q    But you're not an FBI Agent?

6    A    No, sir.

7    Q    All right.  But you worked in the Task Force looking at

8    things that were happening in Syria, or what?

9    A    As a Task Force Officer, what I would do, I'm assigned

10   leads to review to look at to determine whether they are

11   terrorism-related.

12   Q    And so when did you first learn of Warren Clark?

13   A    Well, I first learned from the media back several years

14   ago when I was a police officer, actually a Detective with

15   the City of Sugar Land.

16   Q    In the media?  What did you see in the media that

17   brought your attention of Warren Clark?

18   A    It was the -- there was a broadcast involving an

19   individual that lived in the City of Sugar Land who had

20   traveled overseas into ISIS territory.  I don't remember the

21   exact content of the broadcast was, but I do recall hearing

22   that.

23   Q    It was in 2015, maybe?

24   A    It might have been.  I don't know the exact date on

25   that.  It was just something that was being broadcast on the

1  news, on the nightly news, and I just happened to hear it

2  when it caught my eye it was in Sugar Land.

3  Q    So I'm going to ask you some general questions that I

4  think you'll know the answer to, okay?

5  A    (No audible response.)

6  Q    Is it true that -- oh, yeah, you have some notes up

7  there, right?

8  A    Yes, sir.

9  Q    May I see them?

10  A    Yeah, sure.

11  Q    Okay.

12       (Pause in the proceedings.)

13  A    Do you need to see my Exhibit Book, too, or?

14  Q    No.

15  A    There's no notes on it, but.

16  Q    No.  Thank you.

17       (Pause in the proceedings.)

18  BY MR. DeGEURIN:

19  Q    Is it true that you learned about Warrant Clark in

20  2015, thereabouts?

21  A    I don't know.  I cannot give you the exact date.  I

22  can't promise you the exact date.

23  Q    Not the exact date or the month.

24  A    No, I'm sorry, the year.

25  Q    Okay.

1  A    It was just in passing.  You know, just something that

2  was on the news.

3  Q    Was it on the news that they had found an application

4  to teach at the University of Mosul in 2015?

5  A    At that point, I don't recall.

6  Q    Did you make notes of it?

7  A    No, sir.  I was not part of --

8  Q    No reports?

9  A    I was not a part of the Joint Terrorism Task Force.

10         THE COURT:  Are you asking him if he knew of that

11 then or if he knows of it now?

12         MR. DeGEURIN:  Well, I was asking back then.

13 BY MR. DeGEURIN:

14 Q    But now you know it was 2015, correct?

15 A    That is correct.

16 Q    And was the news report you saw wondering if people

17 that were taught by Mr. Clark in Houston or Sugar Land area

18 might remember him, something like that?

19 A    I do not remember the content of the broadcast.  I just

20 recall back some time ago -- several years ago of an

21 individual from Sugar Land that had gone over to Syria.

22 Q    Probably 2015?

23 A    I cannot give you that date.

24         THE COURT:  No.  He doesn't know.

25         MR. DeGEURIN:  Okay.  All right.

1  BY MR. DeGEURIN:

2  Q    But it was several years ago?

3  A    Yes.

4         MR. McINTYRE:  Your Honor, could I ask?  If he's

5  going to look at the notes, that's great, but if not, could

6  he give them back to the Agent?  In other words, I guess he

7  can look at them or let the Agent have his notes so he could

8  use them to help him answer questions.

9         THE COURT:  Do you need your notes?

10         THE WITNESS:  Yes, sir.

11         THE COURT:  Can you --

12         MR. DeGEURIN:  In a minute I'll get them back so I

13  can read them.

14         THE WITNESS:  Okay.

15         MR. DeGEURIN:  When we take a short break.

16         THE WITNESS:  Sure.

17         THE COURT:  How about this?  Maybe you can get one

18  of your guys to read them, and when you need them, just say,

19  hey, I need them.  I mean, I don't want to --

20         MR. DeGEURIN:  I still want to -- however you-all

21  wanted to do it.

22         THE COURT:  In your notes, is there something that

23  says when you found out about this video?

24         THE WITNESS:  No.

25         THE COURT:  Okay.  So.

1          THE WITNESS:  Yeah.

2          THE COURT:  I mean,

3          MR. McINTYRE:  I think it's a little confusing

4    because it's like (indiscernible).  I think that the

5    question is:  When did he learn of the investigation?  Is

6    probably -- is that where you were going?  Because I --

7       (Many voices at the same time.)

8          MR. DeGEURIN:  Well, no, he's told his --

9          MR. McINTYRE:  -- think he's talked about what he

10   may have heard on the radio or TV or something.

11         MR. DeGEURIN:  He said he heard it, saw it on TV

12   or --

13         THE COURT:  Right.  At this point I'm telling you

14   that his answer is:  I don't know.  So let's go to a new

15   topic.

16      (Pause in the proceedings.)

17   BY MR. DeGEURIN:

18   Q    So several years ago you learned about Warren Clark and

19   you were trying to keep tabs on Warren Clark several years

20   ago?

21   A    No, sir.

22   Q    How about your Task Force?

23   A    Yes, sir.

24   Q    Okay.  But you weren't?

25   A    No, sir.

SCOTT SOSA - CROSS BY MR. DeGEURIN                        53

1  Q     Someone in your Task Force was?

2  A     Yes, sir.

3  Q     And they wrote reports about it?

4  A     Yes, sir.

5  Q     And you've seen those reports?

6  A     No, sir.

7  Q     Did you talk to the officers about those reports?

8  A     No, sir.

9  Q     Okay.

10 A     Well, I'm sorry.  Let me explain it.  They informed me

11 that they were assigned to the Warren Clark investigation.

12 Q     Have you met Mr. and Ms. Clark back here?

13 A     No, sir.

14 Q     His parents?

15 A     No, sir.

16 Q     You did learn, did you not, that in 2018, that the

17 Clarks and Mr. DeGeurin were trying to get the FBI to help

18 get Mr. Clark back to the United States?

19 A     No, sir.  I was not aware of that.

20 Q     So you have not seen any report on the State

21 Department, Mr. Dittoe, the prosecutor from Washington, or

22 any other source, saying that the Clarks had been

23 interviewing with the FBI trying to get information about

24 their son to see if he's safe and to get him back to the

25 United States?

1   A     No, sir.

2   Q     So you had no idea he was trying to come back to the

3   United States; is that correct?

4   A     No, sir.

5   Q     Have you seen -- 'cause one of the entrance he makes is

6   Exhibits 1 through 12, I guess, are all 2015 -- made in

7   2015.

8   A     Yes, sir.

9   Q     Then there's a big jump to 2018 when MSNBC interviews

10  him, correct?

11  A     Yes, sir.

12  Q     Have you seen any reports between 2015 or on Facebook

13  or anything in 2018 about Mr. Clark?

14  A     No, sir.  Just the NBC interview.

15  Q     So is it fair to say that you have no knowledge about

16  how it was that Mr. Clark got into Kurdish custody?

17  A     No, sir.

18  Q     And no one has told you?

19  A     No, sir.

20  Q     'Cause you said to the prosecutor's question, he was

21  captured in a war zone.

22  A     He was captured by the Syrian Democratic Forces.

23  Q     What do you mean by being captured?

24  A     Being detained.

25  Q     Okay.  You don't mean that there were guns on either

1  side and there was a fight, do you?

2  A    I do not know that.

3  Q    You don't know, do you?

4  A    I do not know.

5  Q    That's my point.  I'm not fussing with you.  I'm just

6  saying it sounded like to the Judge that he was captured in

7  some sort of fight.

8          THE COURT:  I didn't take that away, by the way.

9          MR. DeGEURIN:  You didn't?

10         THE COURT:  I didn't.

11         MR. DeGEURIN:  Okay.

12 BY MR. DeGEURIN:

13 Q    It would sound to some people, maybe the Record, that

14 he was captured like there was some kind of fight, right?

15 A    Sir, I do not know.  I was not there.

16 Q    All right.  So when you use the word "captured," exact

17 to the prosecutor's word originally, you didn't mean there

18 had been a fight and people had guns and he was captured in

19 a fight.

20         MR. McINTYRE:  Your Honor, I object to asked and

21 answered.  He doesn't know.  I don't think he has any

22 knowledge of how he was caught, captured, however you want

23 to say it.

24         THE COURT:  I --

25         MR. DeGEURIN:  Okay.

1          THE COURT:  I believe that there is an absence of

2    evidence as to how he got into that room where he's talking

3    to Richard Ingdoll (phonetic).

4          MR. McINTYRE:  I would agree with that.

5          THE COURT:  Okay.  So that's --

6          MR. DeGEURIN:  All right.

7          THE COURT:  And so there is -- so far there is an

8    absence of evidence from between 9/27 of '15 and early

9    January of 2019.

10          MR. DeGEURIN:  '18 -- '19, I mean.

11          THE COURT:  Right?

12          MR. DeGEURIN:  Okay.

13          MR. McINTYRE:  Yes, Your Honor.

14          THE COURT:  Okay.

15   BY MR. DeGEURIN:

16   Q    There has been mention today that there were search

17   warrants to obtain the email correspondence that appeared to

18   be coming from Mr. Clark; is that correct?

19   A    There were search warrants to obtain the social media

20   posts and emails.

21   Q    Were you involved in getting those search warrants?

22   A    No, sir.

23   Q    Okay.  Not that you can reveal what was in the search

24   warrants, but did you see what the allegations were?

25   A    No, sir.

1  Q    Were you part of the FBI team that interviewed with

2  Mr. and Ms. Clark in trying to get their son back from --

3  A    No, sir.

4  Q    -- over there?

5  A    No, sir.

6  Q    Did you know any of the agents?

7  A    No, sir.

8  Q    Ever talk to them, or read their reports?

9  A    No, sir.

10 Q    Okay.  Do you know whether or not Mr. and Ms. Clark or

11 Paige, his sister, gave emails -- copies of emails to the

12 FBI?

13 A    No, sir.

14 Q    Well, there was testimony.  I thought you answered yes,

15 these were given to the FBI by Paige?

16 A    No, sir.

17 Q    So you wouldn't know that?

18 A    No, sir.

19 Q    Do you know -- is it your belief that these exhibits

20 came only through the search warrant?

21 A    Yes, sir.

22        THE COURT:  Wait.  One of them was forwarded to

23 the State Department from the father.

24        MR. DeGEURIN:  That was testimony today.

25        MR. McINTYRE:  Yes, so Mr. Clark sent it to the

1  State Department who sent it to the FBI.

2          THE COURT:  That's not the product of a search

3  warrant?

4          MR. McINTYRE:  I think the original email to the

5  father was captured on (indiscernible).  But it doesn't

6  matter.  But yes, he -- Mr. Clark did send an email first,

7  which I think is Exhibit No. 1, to the State Department

8  before this event.

9          MR. DeGEURIN:  Well, as well as we're talking, do

10 you see the date it was sent?

11         MR. McINTYRE:  I don't know -- I don't know the

12 date yet the FBI got it.  It was sent like in August of 2015

13 and I think it was at the FBI shortly thereafter.

14         THE COURT:  All right.  And I mean --

15         MR. McINTYRE:  But I don't know.

16         THE COURT:  -- I just didn't want the Record to be

17 unclear because I -- and I don't know where you're going, so

18 yeah.

19     (Pause in the proceedings.)

20 BY MR. DeGEURIN:

21 Q    Have you seen any interviews by the FBI or State

22 Department of Mr. and Ms. Clark?

23 A    No, sir.

24 Q    Have you been told about them?

25 A    No, sir.

1   Q    Have you seen any reports of my discussions with the

2   State Department?

3   A    No, sir.

4   Q    How about Paige Clark's discussion with the State

5   Department and/or FBI?

6   A    No, sir.

7   Q    So you don't know, Officer, whether Mr. Clark has been

8   trying to come back to the United States and for how long he

9   had been trying to get back?

10  A    No, sir.

11  Q    Do you know how many times Mr. Clark was imprisoned by

12  ISIS?

13  A    No, sir.

14  Q    Do you know that he was?

15  A    No, sir.

16  Q    Not at all?  Hadn't been told that?

17  A    No, sir.

18  Q    Okay.  I think I asked you this before, I'll ask it

19  again:  When did you become involved in Warren Clark's case?

20  A    A week ago, last week.

21  Q    So the only way you would know about Warren Clark's

22  case starting a week ago was to go back and see or talk to

23  other agents that were involved; would that be correct?

24  A    That is correct.

25  Q    Were you shown things by the prosecutor that would give

1  you information?

2  A    These exhibits.

3  Q    Okay.  You have seen the exhibits that you sponsored

4  today on the witness stand.  Is it true that in the exhibits

5  multiple times Mr. Clark expressed, "I do not want to fight

6  or be in the military?"

7  A    Twice.

8  Q    Two times?

9  A    In the exhibits, yes, sir.

10 Q    Even in his emails to his sister where he capitalized,

11 "I do not want to fight," is that one of them?

12 A    Yes, sir.

13 Q    And in this letter to Mosul University offering to

14 teach over there?

15 A    Yes, sir.  What about that one?  The letter?

16 Q    Yeah.  Is there anything in there about wanting to

17 fight for ISIS or?

18          MR. McINTYRE:  What exhibit is that letter?

19          THE WITNESS:  12.

20          MR. DeGEURIN:  12.

21 BY MR. DeGEURIN:

22 Q    I mean, if you don't know, you don't know.  And if you

23 want to read it, you can.

24 A    (Perusing document.)

25      We're talking about the cover letter, correct, sir?

1  Q    Well, it's the letter saying I'd like to teach.  Yeah,

2  I guess it was the cover letter.

3          THE COURT:  Does everybody agree that nowhere in

4  these exhibits does it say, "I want to fight for ISIS?"

5          MR. DeGEURIN:  I agree, Your Honor.

6          THE COURT:  Okay.  So the only thing there is is

7  this implication that because he was having his room and

8  board paid for, that he probably was a fighter, given what

9  he said in an early email?  That's the inference that you

10 are leaving?

11         MR. McINTYRE:  Yes.  A couple of times he says he

12 does not want to fight.  I don't think it's in Exhibit 12,

13 the letter, Your Honor, but anyway.

14         THE COURT:  I don't think -- so.

15         MR. McINTYRE:  Yes, Your Honor.

16         THE COURT:  And I'm not trying to cut you off, but

17 I mean, the --

18         MR. McINTYRE:  And just for clarity, Your Honor,

19 the Indictment for us is an attempt to indict that ends in

20 October of 2015, so there's not a lot of information.

21         THE COURT:  I understand.

22         Go ahead.

23 BY MR. DeGEURIN:

24 Q    You in your notes, you have a note about the FBI Agents

25 were asked if he ever expressed support for violence against

SCOTT SOSA - CROSS BY MR. DeGEURIN                            62

1  the United States.  And you had his response was no.

2  A    Yes.

3  Q    And that's --

4  A    Or, that's no.

5  Q    How did you get that information?

6  A    I got the information from the FBI Agents that were

7  working the Warren Clark case.

8  Q    Verbal?

9  A    Yes, sir.

10  Q    Not in writing?

11  A    No, sir.

12  Q    Okay.  The Agents -- these are your notes.  The Agents

13  asked Mr. Clark did he have any interest against the United

14  States?  Right?

15  A    Yes.  That is in the notes.

16  Q    And the answer was no?

17  A    Yes.

18  Q    Or the Agent's answer is no?

19  A    Yes.

20  Q    Did he explain --

21          MR. McINTYRE:  I'm going to object his reading off

22  his notes and questioning about his notes after he's taken

23  his notes.  I don't know it's a proper form of impeachment

24  question.

25          THE COURT:  Well, let me just --

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

SCOTT SOSA - CROSS BY MR. DeGEURIN                    63

1            MR. DeGEURIN:  Well, --

2            THE COURT:  -- let me just say that I kind of

3    think he's already testified to these things.

4            MR. DeGEURIN:  Okay.

5            THE COURT:  Right?  I think that what I heard on

6    Direct was every time -- and you're referring in his notes

7    there to the times when he was interviewed before he got on

8    planes, right?

9            And they said, hey, basically, why are you leaving

10   and do you have something -- you know, are you going to --

11   and he denied at every point any interest against the United

12   States, correct?  Isn't that what you're --

13           THE WITNESS:  Yes.

14           THE COURT:  And that's what's in your notes, you

15   were testifying from your notes?

16           THE WITNESS:  That is correct.

17           THE COURT:  We've already testified to the things

18   that are in your notes, right?  I'm asking --

19           THE WITNESS:  Right.

20           THE COURT:  So I mean, I have no problem you

21   asking him follow-up questions about whatever he said, but I

22   think he already said these things that are in his notes.

23   BY MR. DeGEURIN:

24   Q    Were you made aware, Officer, that in -- while

25   Mr. Clark was in custody of the Kurdish forces in January of

1    2019, that he was interviewed by MSNBC Richard Engel?

2    A    Yes, sir.

3    Q    And do you also know that before that he was

4    interviewed by FBI Agents?

5    A    Did not know that.

6    Q    And so the Agents or the Task Force didn't tell you

7    they interviewed him?

8    A    No, sir.

9    Q    You're not aware of that, right?

10   A    No, sir.  I'm not aware of that.

11        (Pause in the proceedings.)

12   BY MR. DeGEURIN:

13   Q    May I ask you when you made these notes?  Was this

14   recent?

15   A    Yes, sir.

16        (Pause in the proceedings.)

17   BY MR. DeGEURIN:

18   Q    So I guess you learn -- and I think you did testify on

19   Direct Examination that Mr. Clark was forced to have what

20   they call military training?

21   A    Yes, sir.

22   Q    But he did not plan on fighting or going to war?

23   A    That's correct.

24   Q    Okay.

25   A    I believe that is noted in my notes.

SCOTT SOSA - CROSS BY MR. DeGEURIN                    65

1  Q    It is, but you didn't -- you weren't present, so

2  someone must have told you that.

3  A    Correct.

4        MR. DeGEURIN:  Your Honor, I'm doing this to speed

5  up time.

6        THE COURT:  Oh, and I'm not clearing my throat

7  because of that, I'm just -- you're fine.  Go ahead.

8  BY MR. DeGEURIN:

9  Q    When was the email exchange between Mr. Clark and the

10  17-year-old?  I mean, what year do you think?

11  A    It was 2000-and -- let me double-check the exhibit.

12      (Perusing documents.)

13        THE COURT:  It's Exhibit 3.

14        THE WITNESS:  Okay.  4/21 of 2015.

15  BY MR. DeGEURIN:

16  Q    Okay.  So it was back in -- several years ago?

17  A    Yes, sir.

18  Q    What happened to that 17-year-old?  Do you know?

19  A    I have no idea, sir.

20  Q    I notice that some of the exhibits say summary, like

21  it's a summary of conversations.  See what I'm talking

22  about, it says, "Summary?"

23        THE COURT:  What exhibit are you referring to?

24        MR. DeGEURIN:  It's all of them, I think, but

25  about the -- see how it says all of them say summary?

SCOTT SOSA - CROSS BY MR. DeGEURIN                    66

1    Summary, like Exhibit 2, for example.

2    BY MR. DeGEURIN:

3    Q    Who made the summary?

4    A    These were summaries that were obtained from the search

5    warrants for social media.  And that was the return on

6    social media.  This is the format that they gave.

7    Q    Okay.  So the word summary doesn't mean -- does not

8    mean summary?

9    A    I would assume it would mean summary.

10   Q    So who would summarize the social media to come up with

11   that paragraph like in Exhibit 2?

12            THE COURT:  Can I just ask?

13            MR. DeGEURIN:  Yeah.

14            THE COURT:  Is this, in fact, the document that

15   was returned from the social media company as the specific

16   -- or did you-all do something to it after?  Do you know?

17            MR. McINTYRE:  He may not know.

18            THE WITNESS:  What's that?

19            MR. McINTYRE:  It's the search warrant return.

20            THE WITNESS:  It's the search warrant return.

21            MR. McINTYRE:  (Indiscernible) based on --

22            THE COURT:  Okay.  So you don't know who

23   summarized it or if it's even a summary?

24            THE WITNESS:  No, sir.

25        (Parties confer.)

1  BY MR. DeGEURIN:

2  Q    Your Honor, I'm going to ask a question and give them

3  time to object, but did you ever see the search warrant

4  return?

5  A    No, sir.

6  Q    Did you ever see the search warrant?

7  A    No, sir.

8  Q    Did you see the Order granting the search warrant?

9  A    No, sir.

10 Q    Okay.  Have you ever interviewed or talked to anybody

11 who interviewed Mr. and Ms. Clark, his parents?

12 A    No, sir.

13 Q    Do you know anything about their background?

14 A    No, sir.

15 Q    Do you have anything negative about their background,

16 any information?

17 A    I know nothing about them, sir.

18 Q    Okay.  When did Mr. Warren Clark, when was he

19 transferred to the United States custody?

20 A    I don't know that, sir.

21 Q    It would be in 2019, I guess?

22 A    Yes, sir.

23 Q    Has the United States Government have a detainer on

24 Mr. Clark?

25 A    I was not aware.  I do not know.

1  Q    Do you know when, if ever, Mr. Clark was given his

2  Miranda Warnings?

3  A    I do not know that, sir.

4  Q    Does -- do you know if Mr. Clark has a passport?

5  A    I do not know that, sir.

6  Q    Is he on a watch list?

7  A    I do not know that, sir.

8  Q    Okay.

9       (Pause in the proceedings.)

10 BY MR. DeGEURIN:

11 Q    How did MSNBC, Richard Engel, how did they know to go

12 and interview Mr. Clark in Kurd custody?

13 A    I do not know that, sir.

14 Q    Was there an extradition hearing in wherever he was

15 arrested by the Kurds before he came back to the United

16 States?

17 A    I do not know that, sir.

18 Q    Okay.

19       MR. DeGEURIN:  I think I'm going to pass this

20 witness.

21       Officer, thank you for your patience.  I

22 appreciate it.

23       And I'll pass the witness.

24       THE COURT:  Redirect?

25       MR. McINTYRE:  No Redirect, Your Honor.

1          THE COURT:  Can he step down?

2          MR. McINTYRE:  He can step down.

3          THE COURT:  But don't go anyway.

4          THE WITNESS:  Okay.

5      (Witness steps down.)

6          MR. McINTYRE:  No further witnesses, Your Honor.

7          THE COURT:  So you rest?

8          MR. McINTYRE:  Rest.

9          THE COURT:  And do you have witnesses?

10          MR. DeGEURIN:  Your Honor, I think I'm going to

11 proffer.

12          THE COURT:  Sure.

13          MR. DeGEURIN:  In the report that you have.

14          THE COURT:  Okay.  So I'm going to take the report

15 as part of the evidence in this case.  That's why I asked

16 everybody if they had an objection to it, so when we argue,

17 you can tell me all about it, but this -- whatever is in

18 here, it's in the evidence.  Everybody agrees to that?

19      (No audible response.)

20          THE COURT:  Yeah?  Okay.

21          MR. DeGEURIN:  The one thing --

22          THE COURT:  But if you have anything else outside

23 of that, you're allowed to make whatever proffer you want.

24          MR. DeGEURIN:  Can I add to what's in the report?

25          THE COURT:  Yeah.

1          MR. DeGEURIN:  That Mr. and Ms. Clark are offering

2    themselves to be the custodian of their son.  He can live

3    with them pending his trial in this case.

4          THE COURT:  Understood.

5          MR. DeGEURIN:  All right.

6          THE COURT:  And where do they live?

7          MR. DeGEURIN:  They live in Sugar Land.

8          THE COURT:  Okay.  Anything else?

9          MR. DeGEURIN:  No.

10         THE COURT:  So do you rest?

11         MR. DeGEURIN:  I do.

12         THE COURT:  Argument?

13         MR. McINTYRE:  Yes, Your Honor.

14       CLOSING ARGUMENT ON BEHALF OF THE PLAINTIFF

15         BY MR. McINTYRE:  Our position, Your Honor, is

16   that the Defendant should be detained.  As you know,

17   there's --

18         THE COURT:  And actually let -- yeah, I was just

19   going to ask you that.  Does everybody agree that there's a

20   presumption in this case?

21         MR. McINTYRE:  We do, Your Honor.

22         THE COURT:  Just before you start again with that

23   -- and I really do apologize for interrupting.

24         MR. DeGEURIN:  Well, I'd have to guess.  They say

25   there's a presumption.  I have not --

1          THE COURT:  Yeah, I looked it up, just to make

2    sure.

3          MR. DeGEURIN:  Yeah.

4          THE COURT:  And I believe that there is because

5    the -- when it's an offense listed in 18 US Code Section

6    2332(B)(g)(5)(B) for which a maximum term of imprisonment of

7    ten years or more is prescribed, there is a presumption.

8    And inside of that statute that I just cited is 18 US Code

9    Section 2339(B).  So there is a presumption for anybody who

10   is listening, what we're talking about is that because of

11   the charge that the law requires me to presume that

12   Mr. Clark, if he were released, poses a danger to the

13   community and a risk of flight, subject to evidence,

14   including evidence in the pretrial report and evidence that

15   was said here rebutting it, so.

16         MR. DeGEURIN:  Your Honor, may I call Mr. Clark

17   for about three or four questions?

18         THE COURT:  Do you mind him re-opening the

19   evidence now that we've --

20         MR. McINTYRE:  No, that's fine, Your Honor.

21         THE COURT:  I don't think -- go ahead.

22         MR. DeGEURIN:  Mr. Clark.

23      (Mr. Clark sworn.)

24         THE WITNESS:  Yes, I do.

25         THE COURT:  Here, come on up here, sir, and have a

1   seat.  And you don't have to put your face right in that

2   microphone.  Just speak up and everybody will hear you just

3   fine.

4            DIRECT EXAMINATION OF WARREN ANTHONY CLARK

5   BY MR. DeGEURIN:

6   Q    Mr. Clark, would you identify yourself for the Court

7   and for the Record?

8   A    My name is Warrant Anthony Clark.

9   Q    And how old are you, Mr. Clark?

10  A    69 years old.

11  Q    Okay.  Is your wife, Betty Clark, in the courtroom?

12  A    Yes.  She is.

13  Q    Do the two of you live together?

14  A    Yes.  We do.

15  Q    How many years have you been married?

16  A    44 years.

17  Q    44 years, okay.  And were you a teacher at one time?

18  A    Teacher for 41 years, military 21 years.  Retired.

19  Q    How about your wife?

20  A    Military 24 years, teacher 38 years.

21  Q    Did both of you retire from teaching?

22  A    Yes.  We are.

23  Q    And did you work extra jobs also while you were

24  teaching?

25  A    Throughout my life, two or three jobs.

WARREN ANTHONY CLARK - DIRECT BY MR. DEGEURIN                73

1  Q    Okay.  And your won, Warren Christopher Clark, was he a

2  teacher?

3  A    He was the substitute teacher in Sugar Land Independent

4  School District.  He also worked in oilfields, and he taught

5  in Saudi Arabia and different places.

6  Q    Okay.  And have you met with your son since he came

7  back to the United States?

8  A    I saw him day before yesterday.

9  Q    And have you told him that you and your -- and his

10 mother would have him come and live with you if the Court

11 allowed that to happen?

12 A    Most like -- most definitely.

13 Q    And also, there is sometimes a requirement that they

14 wear a monitor that shows that if they leave your location,

15 it alerts the Marshals?

16 A    I have no problem with that, sir.

17 Q    Okay.  And do you have any problem with assuring the

18 Court that you and your wife will be his custodian?

19 A    Every day.  We both are retired from two jobs.  We can

20 afford -- we live near the City of Sugar Land.  We have very

21 high security in Sugar Land.  They come by six or eight

22 times a day, so if anyone wanted to monitor my son, it would

23 be no problem.  If I have to hire a security guard --

24        THE COURT:  We're not going to have you hire a

25 security guard.

1            THE WITNESS:  Okay, good.  Thank you, sir.

2    BY MR. DeGEURIN:

3    Q    And would you -- and by the way, he's not in good

4    health, is he?

5    A    He's not.  And that's what's most important to us that

6    number one, he's alive.  And that's been on our mind for

7    about three years.  He's safe.

8    Q    In 2015, is that when you started asking the FBI and

9    the State Department to help bring your son out home?

10   A    Yes.  Because he was like -- he travels.  We don't know

11   where he's at every -- maybe every two months he'll call in,

12   along those lines.  I'm doing this, I'm traveling here.  But

13   we became worried because for some reason it wasn't like him

14   to be missing like he is.

15            I reached out to the State Department and when I

16   reached out to check him out, we told them to look at

17   Turkey.  That's the last time we knew where he was, but

18   normally during the summer, he just travel when he's not

19   teaching, from my understanding.

20   Q    Let me say this -- or let me ask you this:  If he were

21   to come live with you and your wife pending his trial in

22   Galveston, would you see to it that he's well-fed, gets

23   medical attention, that sort of things?

24   A    Yes, sir.  We can afford it.

25   Q    Okay.  And would you provide transportation?

1  A     Transportation.

2  Q     To and from court?

3  A     To and from court, to and from medical facilities,

4  anything he's needing.

5  Q     And did you meet with Pretrial Services yourself?

6  A     Yes.  I did.

7  Q     And did your wife meet with them, too?

8  A     Yes.  They did -- she did, too.

9  Q     Okay.

10         MR. DeGEURIN:  All right.  I'll pass the witness,

11  Judge.

12         THE COURT:  All right.

13         CROSS-EXAMINATION OF WARREN ANTHONY CLARK

14  BY MR. McINTYRE:

15  Q    Mr. Clark, my name is Mark McIntyre, and I work with

16  the US Attorney's Office.

17         How are you?

18  A     Pretty good.

19  Q     And you live in Sugar Land; is that correct?

20  A     Yes, sir.

21  Q     And I guess the witness today was working with the

22  Sugar Land Police Department?

23  A     Exactly.  I even know the Chief of Police -- well, used

24  to be Chief of Police I still imagine.

25  Q     And let me just ask you a couple of questions regarding

WARREN ANTHONY CLARK - CROSS BY MR. McINTYRE          76

1  your son, and I know that you do love your son tremendously

2  and probably everybody here is a father, so we understand

3  how you feel about that.

4          You heard the testimony today; is that correct?

5  A    Yes, sir.

6  Q    And did you hear the testimony about your son advising

7  and assisting, agreeing to assist a 17-year-old entering

8  into ISIS territory, told him he wanted to martyr himself?

9          Did you hear that testimony?

10 A    I heard everything that was said today, sir.

11 Q    Okay.  And what's your view on those actions involving

12 a 17-year-old?

13 A    I really have no opinion on that because I haven't

14 heard all of the evidence.

15 Q    So you don't have an opinion one way or the other about

16 the communications he had with the 17-year-old about martyr

17 himself?

18 A    I don't know the truth -- I don't know that to be true.

19         THE COURT:  Could I just -- because I think it's

20 just fair that I think we all probably understand that you

21 don't approve of that.  You're just saying that you withhold

22 your judgment until you've heard all the evidence.

23         THE WITNESS:  Exactly.

24         THE COURT:  And I would prefer that.

25         THE WITNESS:  Thank you, sir.

1          THE COURT:  We just leave it at that.

2          I understand what you're getting at, Mr. McIntyre.

3          MR. McINTYRE:  Yes, Your Honor.

4    BY MR. McINTYRE:

5    Q    Now at some point in time did you -- or what -- let me

6    ask you this:  What do you think happened to your son in

7    2015?  You received an email and he said he was in the

8    Islamic State; is that correct?

9    A    Yes, sir.

10   Q    What did you think happened to him?

11   A    I thought he got kidnapped, pretty much like he said.

12   Q    So the Defendant told you he got kidnapped; is that

13   right?

14   A    That's my understanding.  He got kidnapped.

15   Q    Kidnapped by who?

16   A    A group of people.  Him and a group of people was

17   traveling and they was -- a group of people was traveling

18   and basically someone just kidnapped him.  I had no idea who

19   kidnapped him.  That's my understanding.

20   Q    Well, did you realize, you know, that he was

21   communicating with your daughter the whole time?

22   A    That's not nothing uncommon for brothers or sisters or

23   parents -- we all been communicating ever since -- every

24   time he goes overseas.

25   Q    No, no, no.  I'm not saying communicating is unusual.

1  What I'm saying is if he's been kidnapped and your sister --

2  your daughter is telling him how to get back and he's saying

3  I'm going to live in the Islamic State.  I'm not a United

4  States citizen, that doesn't sound like a person that's been

5  kidnapped, does it?

6  A    Well, I only can take my son's word.

7           THE COURT:  Wait a minute.

8           How did you learn that from your son?  In an

9  email, or over the phone?

10          THE WITNESS:  If you look at email --

11          THE COURT:  I'm asking -- wait.

12          THE WITNESS:  Okay.

13          THE COURT:  Not if I look at an email.

14          THE WITNESS:  Okay.

15          THE COURT:  Did you learn that from an email?

16          THE WITNESS:  Yes, sir.

17          THE COURT:  So -- and we have this email here.

18          THE WITNESS:  Okay.

19          THE COURT:  That's apparently from you to the

20  State Department.  That's Exhibit 2.

21          I'm sorry, Mr. McIntyre.  I just don't want this

22  to be unclear.

23          Do you see that?

24          THE WITNESS:  Let's see.

25          THE COURT:  It's Exhibit, I'm sorry, 11.  Right?

1    Is that -- do you recognize that email?

2              THE WITNESS:  Let me see.

3              THE COURT:  You forwarded an email to the State

4    Department at some point, right?

5              THE WITNESS:  Yes, sir.

6         (Pause in the proceedings.)

7              THE COURT:  The text of that is your son's words,

8    not yours, right?

9              THE WITNESS:  Oh, okay, yes, sir.

10             THE COURT:  Okay.

11             THE WITNESS:  Because I never seen that.

12             THE COURT:  So you were emailing with your son and

13   you're telling us that your son told you that he was

14   kidnapped?

15             THE WITNESS:  That's my understanding.

16             THE COURT:  Because you know that this says

17   something very different than that?

18             THE WITNESS:  And that's the first I ever seen

19   that.  I never seen that.

20             THE COURT:  Okay.  Go ahead.

21   BY MR. McINTYRE:

22   Q    Well, I guess more importantly, putting aside what your

23   son told you about being kidnapped or not kidnapped, are you

24   telling the Court today you think he was kidnapped or do you

25   think he willingly went across the border to Syria?

1   A    I don't know exactly what happened, no more than what I

2   just told you, sir.  That's my understanding.  Okay?

3   Q    Well, understand, but what's your belief after hearing

4   the evidence in this case and seeing the emails, what is you

5   belief about whether your son was kidnapped?

6   A    I still feel the same way, sir.

7   Q    So you're telling the Court -- you're offering to be

8   his custodian, but you believe that he was kidnapped; is

9   that correct?

10  A    Yes, sir.

11  Q    And did see the -- did you see the video of the

12  interview after he was interviewed by NBC News?  Did he say

13  anything about kidnapping during that interview?

14  A    Well, no, I heard no -- he said in that kidnapping in

15  that interview.

16  Q    Okay.  And you've heard all the evidence today where he

17  says he's not a US citizen, he wants to live in the Islamic

18  State.  He wants to build the Islamic State.  He wants to

19  help the sick and administration and provide room and board.

20  Did you hear all that information?

21  A    Yes.  I heard it.

22  Q    And would you agree with me before he was allegedly

23  kidnapped in 2015, that he expressed support for the Islamic

24  State?

25  A    Say that one -- say that again?

1   Q     So you're telling the Court you believe he was

2   kidnapped in 2015, but you heard testimony today that as far

3   back as 2011, he was expressing support for the Islamic

4   State?

5   A     I heard that, but the only thing I can really comment

6   on, 2015 I reached out for the State Department to help my

7   son.  That's all I really know about what you said, just

8   what I heard today.

9   Q     But -- okay.  And my understanding was that at some

10  point when your son was in the Islamic State that you sent

11  him money; is that correct?

12  A     No.

13  Q     Did you --

14  A     The only thing -- when my son was in Turkey, I sent

15  money to Turkey.

16  Q     When did you send money to Turkey for your son?  What

17  year?

18          THE COURT:  May I just say something?

19          If -- do I need to advise him about his right to

20  counsel?

21          MR. McINTYRE:  I might try.

22          MR. DeGEURIN:  Well, you know, I'm going to at

23  this time object to they're going beyond the scope of

24  Direct.

25          THE COURT:  I'm with you, okay.  Granted.

1           And sir, you are making statements right now that

2    sound like there was money sent -- I don't know if you did

3    or didn't.  I have no idea what the facts are -- to a person

4    who allegedly was part of or trying to be part of a foreign

5    terrorist organization.  It is possible somebody could

6    accuse you of a crime and if you -- you have the right to

7    consult with counsel before you say anything else.

8           So if you'd like to step down?  I think I've heard

9    what I need to hear.  And you can be excused.

10           THE WITNESS:  Okay.

11           THE COURT:  All right?

12           THE WITNESS:  Thank you.

13      (Witness steps down.)

14           THE COURT:  Okay.  So --

15           MR. DeGEURIN:  Now we rest.

16           THE COURT:  You rest?

17           MR. DeGEURIN:  We rest.

18           THE COURT:  Okay.  Now, would you like to make

19    your argument now?

20           MR. McINTYRE:  Yes, Your Honor.  I would.

21           THE COURT:  Thank you.

22            CLOSING ARGUMENT ON BEHALF OF PLAINTIFF

23           BY MR. McINTYRE:  Your Honor, as we said before,

24    this is a presumption case.  There's a presumption of

25    flight.  There's a presumption of danger.  And the facts in

1   this case clearly demonstrate that he is a danger.

2           He professed, I guess, professed loudly that he

3   was in favor of violent Jihad since 2011 on several

4   different forums that caused people alarmed to the point

5   that they called the FBI on YouTube, Jihadi Fan Club

6   channel, and then on the Muslim Public Service Group website

7   in 2014.

8           So that inclination pre-dated his time before he

9   was in 2015.  And as the Court knows, once he was in 2014,

10  from reading the emails he got off the flight and was

11  heading back to the United States on his volition, went into

12  Turkey and crossed over into the Islamic State and as the

13  Court knows, our (indiscernible) ends in 2018 and we're not

14  expressly advocating that the support he gave was military

15  support.  What we're telling the Court is that he expressed

16  the support to build the Islamic State, which has measures

17  to October 2015.

18          He took measures to enter the Islamic State.  He

19  worked and helped build the Islamic State by his own

20  volition during that time period until he was ultimately

21  captured in 2018.

22          Hand on just a second.

23      (Pause in the proceedings.)

24          BY MR. McINTYRE:  And Your Honor, we also believe

25  that he's a flight risk, Your Honor, in that he has

1   extensively traveled.  He's lied to law enforcement, we

2   think, on at least one occasion.

3         THE COURT:  What occasion is that?

4         MR. McINTYRE:  When he claimed that he did not

5   advocate violence against the United States or suggested

6   violence against the United States in 2013.

7         So our position, Your Honor, is that he is a

8   flight risk and a danger to the community and more

9   importantly, whether he fought or did not fight, he received

10  military training as an ISIS fighter.  He lived in the

11  ISIS-held territory, Mosul, Iraq and Syria, for over three

12  years.

13        He was interviewed and the Court saw his demeanor

14  when asked about crucifixions and beheadings that he had

15  witnessed, and he compared them comparable to an execution

16  in Texas after a trial and appeal and due process, Your

17  Honor.

18        And he was asked about, well, when you came to the

19  Islamic State, did you know what you were getting into?  And

20  he said yes.  I saw the videos, and I asked him about the

21  atrocities.

22        So you have someone that since 2011 has advocated

23  for violent Jihad, killing of prisoners, all of these

24  things, has seen it in ISIS firsthand, and been non-affected

25  by it -- or seems to have no affect on him.  He seems to

1  think it's justified.  It's part of living in an Islamic

2  country.

3          And so he has also been trained militarily.  So

4  Your Honor our position is he is a flight risk.  He is a

5  danger to the community and the presumption certainly hasn't

6  been overcome.

7          Thank you, Your Honor.

8          THE COURT:  All right.  Mr. DeGeurin?

9          CLOSING ARGUMENT ON BEHALF OF DEFENDANT

10         BY MR. DeGEURIN:  One would repeat that the

11  information that the prosecutor is relying upon came in 2011

12  through 2015.  From 2015 to 2018 when he was leaving ISIS

13  area and coming to another country, when he was taken into

14  custody by the Kurdish military.  That's 2018.

15         Between 2015 and 2018, Mr. and Mrs. Clark and I

16  have been trying to get the FBI and the State Department to

17  help us get Mr. Clark out of ISIS and back to the United

18  States, which he accomplished on the 15t of January, I

19  believe it was, of 2000- -- no, no, no, that's not right.

20  Whatever the date was that he --

21         THE COURT:  I understand, yeah.

22         MR. DeGEURIN:  He was taken into custody.  He then

23  went on MSNBC -- we can't go into the details of that, of

24  how that happened, but it's not real clear other than Engel

25  asked him, Well, you knew that they beheaded and killed

1    people that the ISIS Government did?

2            Yes, I saw it -- not that he saw it in person, but

3    he saw it on TV or whatever.  And he does compare that with

4    -- 'cause we're from Texas and we execute people in Texas.

5    He didn't finish, we do it a little after midnight, but it's

6    very gross if you saw it in person.  That's just the way

7    that Government works.

8            But he wanted out there and wanted to come back to

9    the United States and will face whatever punishment he might

10   get, or having at one time been curious enough as a

11   political scientist to go there and to see what it's like to

12   live in a state, we understand from Wikipedia, 8 million

13   civilians at one time in 2015.  Not all of them are being

14   prosecuted for being part of the Islamic State, but he's

15   coming back.

16           And with the aid and help of his mother and

17   father, who are great people, he will live with them.  And

18   we all -- I think he's sitting -- he's been in a wheelchair

19   except for today.  He can't run.  He can only walk because

20   of his injuries.

21           And he's here voluntarily.  So is he a flight

22   risk?  Would his mother and father take him to an airport

23   and secret him away?  No.

24           Is he going to slip out of his house if he's got a

25   monitor on and slip to the airport himself?  No.

1          His mother and father would be there the whole

2  time.  And they give you their word that they will watch

3  him.

4          So under all those circumstances, I submit that it

5  would be the humane thing to do to allow him conditions of

6  release that we surely overcome the presumption that Mr. and

7  Ms. Clark taking care of him pending trial.

8          And that's what I'd ask from the Court.

9          THE COURT:  All right.  Anything else from either

10  side?

11          MR. DeGEURIN:  Oh, by the way?

12          THE COURT:  Yes, sir.

13          MR. DeGEURIN:  No criminal record as you saw in

14  the report.

15          THE COURT:  I understand.

16          MR. DeGEURIN:  There's no record.

17          THE COURT:  Anything else from anybody?

18          MR. McINTYRE:  No, Your Honor.

19                    COURT'S RULING

20          THE COURT:  All right.  So just for clarity, I am

21  relying on the evidence that came from the witness stand.

22  There was a lot of lawyer talking.  Other than things like

23  dates and you know, parts of the Record, I'm not relying on

24  what the lawyers say, other than as legal argument.  I'm

25  relying on this Pretrial Services Report and these exhibits.

1          There is, like I said earlier, there is a

2    presumption in this case that Mr. Clark, both is a danger to

3    the community and a risk of flight.  Even when rebutted, the

4    presumption does not disappear.  It simply carries as a

5    factor in the case that still has to be weighed with respect

6    to everything else.

7          I think where the -- a lot of this -- the

8    testimony was focused from the Defendant's point of view is

9    that there's quite a bit of evidence through 2015 and then

10   this vacuum of evidence from 2015 until, lo and behold, he's

11   being interviewed by Richard Engel.  That's an absence of

12   evidence.  That's not affirmative evidence.

13         And to the extent that there were questions about

14   you don't know that this happened or you don't know that

15   that happened, I don't have evidence -- maybe I can believe

16   that the family wanted him back, but I have no evidence to

17   suggest that he wanted to come back.

18         So there's three years where he's just inside of

19   the Islamic State doing who knows what?  And that -- so I

20   cannot use this absence of evidence as a factor in thinking

21   that either the presumption is rebutted or that there is not

22   a risk of flight or dangerousness because it says to me that

23   his -- you know, all of his emails, all of his

24   communications indicated that he was completely happy with

25   his situation, that he was over there participating in the

1  Islamic State, that he was, you know, in fact, trying to
2  improve his lot and get another job, that he didn't want to
3  come back to the United States, that he professed himself to
4  no longer be a citizen of the United States, and then, in
5  fact, just disappeared.
6          He crossed a border and at least a couple of
7  borders, I think, because I think we have him being present
8  in Syria.  We have him being present in Turkey.  And we have
9  him being present in Iraq.  He has traveled extensively.
10         This promotion of this ISIS-related ideology to a
11  17-year-old, which is unrebutted, is extremely troubling and
12  I think we all know that the question is not necessarily --
13  the entire question is not:  Will he run off again to Syria
14  or Iraq or somewhere else?  The question is whether he will
15  continue to promise this ideology in the United States,
16  which is part of the danger that this particular terrorist
17  organization poses.
18         He has, in fact, normalized the -- based on the
19  evidence that I'm seeing and I'm not making judgments on him
20  as a person.  It is very clear that he's not troubled at all
21  by extreme violence and he did, in fact, know that that
22  extreme violence existed and was being carried out before he
23  even left.
24         As to Mr. Clark's father, Warren Clark, I guess,
25  Senior, I cannot find that he could be a suitable surety or

1    custodian because he is in the face of this email that he,

2    himself, forwarded to the State Department, which says that

3    he's over there and he appears to be okay.  And he doesn't

4    want to come back to the United States because he thinks

5    he's going to be arrested.

6           And there's no mention -- nobody -- I mean, unless

7    I'm -- there's nothing in any of this evidence to suggest

8    that he was kidnapped.  In fact, all the evidence suggested

9    that he went there willingly and he was involved willingly

10   and he remained there willingly and he was quite satisfied

11   with his lot in life while he was over there.

12          So in light of strong evidence of why he was there

13   and then this notion that, well, he was kidnapped, and it's

14   very clear he does not want to say things that are negative

15   towards his son and I don't think that the parents are going

16   to prevent -- and this is not to say anything negative about

17   the parents.  They are parents.  They care about their son.

18   But I don't see them, in light of the nature of this case,

19   as being -- their presence as a surety or a third-party

20   custodian would prevent him from being a flight risk or a

21   danger.

22          So with all that being said, and I'll try to put

23   this in a more organized fashion in my written Order that I

24   will file tomorrow, I don't think the presumption has been

25   rebutted as to either danger or risk of flight.  But even if

1   it had been, I find that he is a risk of flight and a

2   danger.

3           So Mr. Clark, I'm going to detain you pending the

4   trial in your case.  And you'll have -- you'll be able to

5   visit with your lawyer, and your next hearings will be in

6   front of Judge Hanks in Galveston.

7           Is there anything else?

8           MR. DeGEURIN:  Judge, can you recommend to the

9   Marshals Office that he get some medical help for his leg?

10  He's filled out the paperwork, but it's been a week now and

11  has not seen a doctor.

12          THE COURT:  So where is the Marshal?  Do you now

13  anything about that?

14          US MARSHAL:  I don't, Judge.

15          THE COURT:  Okay.

16          US MARSHAL:  But the standard procedure is he

17  would fill out the paperwork.  They would have to forward it

18  to us and if it qualified for what he's saying, we would

19  approve it.

20          THE COURT:  Okay.  Trust me, I know what you're

21  talking about, and I know also that that doesn't happen.  So

22  would you please see to it that he's seen by a doctor

23  regardless of what his form might say?

24          Because that's the problem.  They read them very

25  carefully.

1           US MARSHAL:  Right.

2           THE COURT:  So would you just command Joe Corley

3    to have him seen by a medical doctor, please?

4           US MARSHAL:  I'll do it.

5           THE COURT:  All right.  Is there anything else?

6           MR. DeGEURIN:  No, Your Honor.

7           THE COURT:  All right.  Then you're excused.

8           Thank you.

9           COURTROOM DEPUTY:  All rise.

10       (Proceedings adjourned at 4:17 p.m.)

11                      *  *  *  *  *

12        *I certify that the foregoing is a correct*

13   *transcript to the best of my ability produced from the*

14   *electronic sound recording of the proceedings in the above-*

15   *entitled matter.*

16   */S/ MARY D. HENRY*

17   *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

18   *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

19   *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

20   *JTT TRANSCRIPT #61336*

21   *DATE FILED:  DECEMBER 16, 2019*

22

23

24

25